**ATLANTIC COAST LINE RAILROAD COMPANY, Appellant,**

v.

**Albert Gregor KAMMERER, Appellee.**

**No. 16097.**

United States Court of Appeals Fifth Circuit.

Nov. 30, 1956.

Chris B. Conyers, Brunswick, Ga., Frank G. Kurka, Wilmington, N. C., Charles L. Gowen, Brunswick, Ga., for appellant.

James P. Mozingo, III, Darlington, S. C., Gordon Knox, Jr., Hazelhurst, Ga., J. H. Highsmith, Baxley, Ga., E. Way Highsmith, Brunswick, Ga., for appellee.

Before HUTCHESON, Chief Judge, and BORAH and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

Here for the third time, Atlantic Coast Line Railroad Co. v. Kammerer, 5 Cir., 1953, 205 F.2d 525; Id., 5 Cir., 1955, 218 F.2d 149, the Railroad again appeals from an adverse verdict and judgment awarding damages for the death of Albert Kammerer, Jr., on August 14, 1951, when the automobile he was driving at 1:30 in the morning crashed into a boxcar and locomotive engine on a spur track crossing Albany Street in Brunswick, Georgia.

Stressing again, as twice before, its main claim that directed verdict ought to have been granted, the Railroad seeks, on the ground that the record is quite different, to avoid the impact of our implied rejection of this plea in twice remanding the case for a new trial. We see no real difference, nor any reason, Seagraves v. Wallace, 5 Cir., 69 F.2d 163; Commercial National Bank in

Shreveport v. Connolly, 5 Cir., 176 F.2d 1004; Atchison T. & S. F. Railway Company v. Ballard, 5 Cir., 108 F.2d 768, certiorari denied 310 U.S. 646, 60 S.Ct. 1096, 84 L.Ed. 1413, to alter our prior holdings that plainly recognized that, the record remaining similar, it was a case for the jury.

Young Kammerer was driving north on Albany Street which runs north and south. The approach from the south was straight and unobstructed for at least a half mile. The railroad main line paralleled Albany Street two blocks to the east. Curving slightly in a southwesterly direction off the main line, this spur track crossed Albany at Q Street, an unlighted intersection in a sparsely settled area. Use of the spur was discontinued in 1949 and resumed only slightly [1] in April 1951 at which time occasional switches in the daytime and not more than one during the night were sometimes made in spotting cars in connection with a current nearby construction project. On this occasion the locomotive with one boxcar ahead left the main line where a fifty car train was being made up and came down the spur. The conductor was hunting for an empty car needed elsewhere and hoped to find one in the two cars then on the spur just west of the intersection of Q and Albany. The locomotive headlight was deliberately cut off as the light beams against the end of the boxcar being pushed obscured the engineer's vision. The end of the boxcar was pushed beyond Albany Street, apparently about 25 to 30 feet wide, and the locomotive stopped so that the space between the end of the locomotive and the boxcar, described as about the width of an automobile, was then about in the lane which a northbound automobile would use. With the boxcar-locomotive thus blocking the crossing in total darkness, the conductor (with his train completely blocking his view of traffic coming up Albany) walked ahead to the parked boxcars in search of the empty one. There were no signal lanterns or other lights on the south side of the train visible to an automobile approaching from that direction. While the train was thus stopped, Kammerer's automobile hit the side of the train becoming wedged between locomotive and boxcar. There were no skid marks and presumably he never saw the train blocking the crossing until he was almost on top of it, or at least the jury could have found he did not see it in *fact.*

The question is: does the law deem that he must have seen it so that failing to see, or seeing, failing to stop, or traveling at a speed which made either or both impossible, was the sole cause rather than the lack of lights, fusees, or other warning devices by the Railroad?

The case is controlled by the Georgia "Standing Train" rule that requires that there be something unusual or extraordinary about the situation at the crossing before an automobile driver will be excused for not seeing, or conversely, a railroad subjected to the duty of giving a warning of the presence of a thing so obvious. It is, so long as reason is employed in its application, well described as a rule of common sense—for it says that no warning need be given of the presence of a thing plainly visible within the range of the statutory headlight requirements, to a person of prudence.

But it ceases to be common sense if it is applied with ritualistic absolutism either to deny duty in all cases or limit, as would the Railroad here, the so-called "exception" to cases where visibility is significantly impaired by "fog, mist, or rain." A fair reading of Georgia deci-

---

1. In the four months resumption of use, only 86 boxcars had been switched on to this spur. The limited use intended was shown by Bulletin No. 11 issued by the Brunswick Freight Agent: "Effective date and until further advised Q street main line will be designated and used as a dray track for the delivery of shipments consigned to 'Bright Water Construction Company' who are constructing colored housing project between K and M streets. These cars shall be placed just west of Albany street clearing all street crossings."

sions demonstrates, we think, that these are illustrative only of the fundamental principle, "Every case of this sort must, in the last analysis, be determined upon its own facts * * *. * * * that in particular circumstances due care for the safety of travelers would require the placing of a guard, light, or other warning at a proper point for the purpose of giving notice for the time being that the street was obstructed * * *," Mann v. Central of Georgia Ry. Co., 43 Ga.App. 708, 160 S.E. 131, 132; 48 Ga.App. 668, 173 S.E. 180.

■ And the questions then arise: was the crossing apparent and could the train reasonably have been seen? Was there some condition—of which the railroad was charged with knowledge—that would impede or impair the probable actual sighting of the train by an approaching, prudent motorist? These are patently questions of fact requiring proof by traditional evidence. A proper regard for the function of the jury and the restraining influence of the Seventh Amendment immediately suggest that the "fact" explanation will ordinarily be for the jury, not the court, Lowry v. Seaboard Airline R. Co., 5 Cir., 171 F.2d 625, at page 630.

To meet the Georgia standard, evidence was offered to show that, if the location of the crossing were known or imputed to this young man who had long been a local resident, there was yet no expectation that the spur was, or would be used, or the crossing blocked under these circumstances, and by reason of the absence of markers and the general location and situation of the crossing, the train itself would not be visible, as the best warning, to an approaching car.

Albany Street is level and quite narrow with a macadam built-up rock or gravel topping. The spur track crossing is perfectly flat, with the rails sunk below the street surface with weathered planks between the rails. Except for actual knowledge, or seeing a warning sign on the right shoulder, the presence of the crossing, as such, is not evident. Q Street, as it comes into Albany, and the shoulder on both the east and west side of Albany adjacent to the rail spur tracks, are the ordinary, typical, soft dirt, uneven surfaces with automobile tire marks and ruts. Looking down the spur track as it ran down Q west of Albany, the loose dirt and weeds either covered or almost completely obscured the tracks. And looking east, the surface dirt, weeds, and a heavy jungle-like growth of bushes and trees concealed the tracks and, of course, this concealed all but the front end of the locomotive as the train blocked the crossing. Unless one knew that the spur was being used, it had all of the appearances of an abandoned track which, indeed, it had been for over two years with limited use resumed but recently and then under circumstances imputing little knowledge to those frequenting this street. Because of this, traditional statutory warning signs were important. But it was uncontradicted that in the place of the "X" type sign mandatorily required, there was a flat "backboard" type with painted warning: "Georgia Law—Stop —Unsafe RR Crossing." But on the south side of the tracks, this sign and its warning legend was significantly obscured by low hanging branches and Spanish moss from a nearby oak tree. And if the signboard itself could, from point to point depending on the position of the limbs and moss, be seen by an approaching motorist, the warning legend could not be read from far off and nothing distinguished it from an advertising billboard. This tree, as well as other large oaks with low hanging foliage lining the east shoulder of Albany for a considerable distance, extended out well over the street so that, as the car was proceeding up Albany Street, it was approaching an area in which the trees created many shadows from the moonlight which, until too late, would keep the automobile headlights from revealing the presence of a stationary, unlighted, dark-colored boxcar and locomotive with substantial space in between them.

In this setting the question and its corollary of the decedent's speed and conduct, under competent instructions, was submitted to the jury to determine whether in *fact* the presence of the train was not reasonably apparent to Kammerer as he approached. It was, we think, under Georgia law[2] for the jury.

This disposes also of the contention that Kammerer's speed[3] was negligence as a matter of law equaling or exceeding, Georgia Code, § 105–603, the negligence of the Railroad, and thus compelling a directed verdict. The word testimony was estimates of "high rate of speed" or similar language and, by one Railroad employee whose ability to see and estimate was sharply attacked, an estimate of 50 to 75 miles per hour. Evaluation of such intangible opinions is a traditional jury function. Nor was

2. The rule is expounded in many cases: Burnett v. Louisville & Nashville R. Co., 58 Ga.App. 64, 197 S.E. 663; Pollard v. Clifton, 62 Ga.App. 573, 9 S.E.2d 782; Bassett v. Callaway, 72 Ga.App. 97, 33 S.E.2d 112; Atlantic Coast Line Railroad Co. v. Marshall, 89 Ga.App. 740, 81 S.E. 2d 228; Mann v. Central of Georgia Ry. Co., 43 Ga.App. 708, 160 S.E. 131; 48 Ga.App. 668, 173 S.E. 180; Gay v. Smith, 51 Ga.App. 615, 181 S.E. 129; Shelley v. Pollard, 55 Ga.App. 88, 189 S.E. 570; Southern Railway Co. v. Riley, (Southern Railway Co. v. Sanders), 57 Ga.App. 26, 194 S.E. 422; Central of Georgia v. Heard, 36 Ga.App. 332, 136 S.E. 533; Central of Georgia v. Burton, 33 Ga.App. 199, 125 S.E. 868; Atlantic Coast Line R. Co. v. Newsome, July 7, 1954, 90 Ga.App. 509, 83 S.E.2d 333; and Savannah & Atlanta Ry. Co. v. Newsome, 1954, 90 Ga.App. 390, 83 S.E.2d 80.

Any effort to make a comparative analysis is futile for, following the precaution of Mann v. Central of Georgia Ry. Co., supra, that "Every case of this sort must, in the last analysis, be determined on its own facts * * *," the nuances are so subtle that for a given accident, a single event, liability is held both to exist and not exist. See, e. g., Atlantic Coast Line R. Co. v. Marshall, 1954, 89 Ga.App. 740, 81 S.E.2d 228 and 1955, 93 Ga.App. 134, 91 S.E.2d 96, companion case Atlantic Coast Line R. Co. v. Clements, 1955, 92 Ga.App. 451, 88 S.E.2d 809, Atlantic Coast Line R. Co. v. Coxwell, 1955, 93 Ga.App. 159, 91 S.E. 2d 135 which overrules, in part, the Stains case; and Georgia Northern Ry. Co. v. Stains, 1953, 88 Ga.App. 6, 75 S.E.2d 833, companion case to Hathcock v. Georgia Northern Ry. Co., 1954, 90 Ga. App. 533, 83 S.E.2d 329.

It is adequately and recently analyzed and reviewed by a Georgia Court, Savannah & Atlanta Ry. Co. v. Newsome, 90 Ga.App. 390, 83 S.E.2d 80, at page 83: "There are circumstances where due care for the safety of others would require a railroad obstructing a crossing to place a guard, light, or some other warning at a proper point to give notice for the time that the crossing is obstructed. Mann v. Central of Georgia Ry. Co., 43 Ga.App. 708, 711, 106 S.E. 131; Atlantic Coast Line R. Co. v. Marshall, 89 Ga. App. 740, 743, 81 S.E.2d 228. An illustration of such circumstances is a 'misty and foggy morning.' Gay v. Smith, 51 Ga.App. 615, 616, 181 S.E. 129. Except in clear and indisputable cases, whether particular circumstances require such action on the part of the railroad is a question for a jury's determination. Central of Georgia R. Co. v. Mann, 48 Ga.App. 668, 670(7), 173 S.E. 180. A jury might also be authorized to find that the defendant was negligent in allowing the crossing sign to remain down. Southern R. Co. v. Riley, 57 Ga.App. 26, 27(3), 194 S.E. 422. The petition did not show that the plaintiff was guilty of such negligence as would preclude a recovery. The fact alone that he was familiar with the crossing does not show such negligence. Especially is this true in the instant case, where it was alleged that the plaintiff was relying on the crossing sign to warn him of the close proximity of the crossing and, upon not seeing it, believed he was farther from the crossing than he actually was. One is not always required to drive so that he may stop within the range of his headlights. McDowall Transport, Inc., v. Gault, 80 Ga.App. 445, 447, 56 S.E.2d 161. As to the condition of the crossing being such as would throw the driver's headlight beams under the boxcars, see Burnett v. Louisville & N. R. Co., 58 Ga.App. 64, 197 S.E. 663."

3. Also the asserted error in refusing requested charge No. 8 that " * * * the evidence * * * *demands* a finding * * * that Kammerer * * * was guilty of negligence as a matter of law violating the valid speed ordinance of the City of Brunswick * * *."

there any adequate testimony that would require a court to conclude that the destruction of the car and the appearance of the wreckage caused by its striking this immovable object (locomotive and boxcar) established positively that speed was excessive, or compelled absolute acceptance of an opinion of "high speed" by one witness based thereon.

 Nor do we find error in the other exceptions to the Court's charge in which he sought carefully to comply with our decisions, Texas-New Mexico Railway Co. v. Bailey, 5 Cir., 203 F.2d 647; Atlanta & St. Andrews Bay Railway Co. v. Church, 5 Cir., 212 F.2d 688, and prior directions. One complained of the submission of negligence and proximate cause for the admitted failure to use an "X" type sign at the spur crossing.[4] One sought a pre-emptory charge that Kammerer was familiar with the crossing. The support for this apparently was the fact that he had long lived in Brunswick. But knowledge was far from being positively established, and it was properly left by the Court to

the jury[5] to draw the inferences. One, instructing the jury that the evidence "demands a finding * * * that the bell on the train was ringing at the time of the collision * * *" was presumably based on the Georgia Code[6] provision on Positive-Negative testimony. But this too ignored the conflict which it is the jury's function to resolve, Atlantic Coast Line R. Co. v. Key, 5 Cir., 196 F.2d 64, 66; Atlantic Coast Line R. Co. v. Hadlock, 5 Cir., 180 F.2d 105, between the train crew members as well as two disinterested witnesses neither of whom saw, or could see, the train at the time to assert positively whether it was *before* not *after*, and that the locomotive was on the crossing, not on or leaving the main track, when the bell first began ringing. The last, instructing that the Railroad was not negligent in occupying the crossing, as a truncated excerpt[7] from a Georgia opinion, was incomplete and erroneous itself.

 There is no substance to asserted error on the receipt of evidence. Examination and cross examination of

4. The "X" signs are required by an Order of the Georgia Railroad Commission pursuant to Georgia Code, § 94–511. The Railroad first contended that Public Law No. 300, August 20, 1925, rescinded that Order, but, the Railroad conceded on the trial that by #1 that law applies expressly only to crossings "not in an incorporated town or city." The Georgia "Standing Train" cases, note 2, supra, certainly do not, as a matter of law, excuse the maintenance of statutory warning signs.

5. The Court did charge "that in the absence of any evidence to the contrary, it may be reasonably presumed that the deceased * * * Kammerer * * * was familiar with the crossing." Additionally, the requested charge was technically deficient since the question was familiarity with the probable use of the spur track and crossing rather than its mere physical existence alone.

6. Section 38–111, Georgia Code: "Positive and negative testimony.—The existence of a fact testified to by one positive witness is to be believed, rather than that such fact did not exist because many witnesses who had the same opportunity of observation swear that they

did not see or know of its having existed. This rule shall not apply when, two parties having equal facilities for seeing or hearing a thing, one swears that it occurred, the other that it did not."

The Court charged the jury in the exact words of the Georgia Code.

7. The requested charge was in the following words, which we have set off in brackets [ ], from Atlantic Coast Line Railroad Co. v. Marshall, 89 Ga.App. 740, 81 S.E.2d 228, 231, but with no indication that unusual or special conditions (note 2, supra) would impose duties on the Railroad: "* * * The *mere act* of stopping railroad cars on a crossing for such a length of time as might be reasonably necessary in the conduct of the railroad's business would not constitute negligence on the part of the defendants. Other facts must be shown, to place on a railroad and its employees the duty to give the traveling public warnings of the presence of the train on the crossing, in addition to that which is given by the train itself. Mann v. Central of Georgia Ry. Co., 43 Ga.App. 708, 160 S.E. 131; Gay v. Smith, 51 Ga.App. 615, 181 S.E. 129. * * *" (Italics by Georgia Court of Appeals.)

Railroad crew members concerning company safety rules, already admitted in evidence without objection, and the withdrawal of questions not patently inadmissible after objection but before answer, were typically matters under the governance of the Trial Judge, Maryland Casualty Co. v. Reid, 5 Cir., 76 F.2d 30. Admission of an ordinance [8] of the City of Brunswick, Georgia, prohibiting the unnecessary blocking of a railroad crossing was certainly proper as an element under the Georgia Standing Train rule (note 2, supra). And as a piece of relevant testimony, it could not be excluded by an objection which anticipated that the conflict [9] as to the length of time the train blocked the crossing, or proximate cause, would ultimately be resolved in the Railroad's favor by court or jury.

The only remaining complaint is the failure of the Trial Court to grant a new trial because of the excessiveness of the verdict as a matter of law. Insofar as this attack is a criticism that the amount fixed exceeds the commuted present cash value under the Lumpkin (Florida Central & P. R. Co. v. Burney, 98 Ga. 1, 26 S.E. 730) or the alternative Georgia formula, the error of calculation, if any, is, in the one case, trivial in amount, and in the other not of a kind to compel, as distinguished from permit, correction by the Trial Judge. Under the principal attack that the amount, being substantially the maximum allowable on maximum assumed earning capacity of the decedent, the verdict patently failed to allow any reduction for Kammerer's contributory negligence, it is an unsupportable effort to obtain a *partial* directed verdict because of his speed and actions as a *major* cause of the occurrence where, as we have shown, a *full* directed verdict would invade the province of the jury. Reduction of damages under Georgia comparative negligence was for the jury under the most elaborate instructions which met with no objections from the Railroad. Moreover, ours is a narrow review for "Limited as it is by the Seventh Amendment, * * * [this Court's] * * * power and duty extend only to cases in which the verdict is excessive as matter of law, that is, is so gross or inordinate in amount as to be contrary to right reason." Sunray, Oil Corp. v. Allbritton, 5 Cir., 188 F.2d 751, certiorari denied 342 U.S. 828, 72 S.Ct. 51, 96 L.Ed. 626. Southern Ry. Co. v. Montgomery, 5 Cir., 46 F.2d 990, 991; Atlantic Coast Line R. Co. v. Burkett, 5 Cir., 192 F.2d 941, 944; Atlantic Coast Line R. Co. v. Pidd, 5 Cir., 197 F.2d 153, 156, certiorari denied, 344 U.S. 874, 73 S.Ct. 166, 97 L.Ed. 677; Fort Worth & Denver Ry. Co. v. Harris, 5 Cir., 230 F.2d 680, 682; Whiteman v. Pitrie, 5 Cir., 220 F.2d 914; Texas & Pacific Railway Co. v. Buckles, 5 Cir., 232 F.2d 257, certiorari denied 351 U.S. 984, 76 S.Ct. 1052, 100 L.Ed. 1498; Kansas City Southern Railway Co. v. Justis, 5 Cir., 232 F.2d 267, certiorari denied 77 S.Ct. 49.

And thus, as it must to all litigation, this case, in this Court, comes to its final end.

Affirmed.

---

8. "525.—No street crossing shall be blocked or obstructed by any railroad train, car or engine for longer at any one time than five minutes, and then only to allow the coupling and uncoupling of cars, cases of accident and absolute necessity excepted."

9. Testimony of Doctor Rish, a member of the Coroner's jury investigating this accidental death, that the locomotive engineer testified that he blocked the crossing from five to seven minutes was, in the light of the Coroner's jury function in Georgia, admissible though contrary to a stenographic report of that proceeding which, in at least one other material respect, was shown to have been erroneous. Clifton v. State, 187 Ga. 502, 2 S.E. 2d 102; McKinney v. Carmack, 119 Ga. 467, 46 S.E. 719; Brown v. State, 76 Ga. 623.